UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION



ADOLF JEWELERS, INC.,

Plaintiff,

v.

JEWELERS MUTUAL INSURANCE
COMPANY,

Defendant.

Action No. 3:08-CV-233

## MEMORANDUM OPINION

THIS MATTER is before the Court on Cross Motions for Summary Judgment

filed by Plaintiff, Adolf Jewelers, Inc. (Docket No. 24), and Defendant, Jewelers

Mutual Insurance Company (Docket No. 27).  For the reasons discussed below,

Defendant's Motion for Summary Judgment as to the issue of coverage under

separate policy periods, as opposed to under the 2006–07 policy period only, is

GRANTED, therefore Plaintiff's Motion for Summary Judgment as to the identical

issue is DENIED.  As to the issue of loss calculation methods, understatement of loss,

and bad faith, Plaintiff and Defendant's Motions are DENIED and these will be the

sole issues to be addressed at the trial on October 29–30, 2008.

## I.  BACKGROUND

### A.  Factual background

Adolf Jewelers ("Adolf") is a local retail jewelry store located in Henrico

County, Virginia.  (Pl.'s Mem. in Supp. of Mot. for Summ. J. 3.)  Adolf has carried a

Jewelers Pak insurance policy from Jewelers Mutual Insurance Company ("JMIC") since 1999. (Id.) This insurance policy contained Employee Dishonesty coverage. (Id.) The coverage limit was $200,000 before September 30, 2006, but was increased to $500,000 of coverage in 2006 for the 2006–07 policy period. (Id.) The policies' coverage spanned twelve months—October 1 to September 30 of the following year. This increase in coverage was a result of a recommendation that Adolf maintain coverage for employee dishonesty equal to 10% of its annual sales. (Id.)

In June 2007, Adolf discovered its employee, a security guard named Edward Goodman, had embezzled hundreds of thousands of dollars from the company over a period of years. (Id.) Goodman pled no contest in Henrico County Circuit Court to embezzlement and was ordered to pay $593,000.00 in restitution. (Id.) In August 2007, Adolf submitted a claim to JMIC for $684,774.76 as a result of Goodman's embezzlement. (Id.) JMIC hired Studler, Doyle & Company ("SDC") to adjust the claims according to JMIC's policies. (Id. at 4.) The adjustments took into account only those items which could be confirmed as sold by Goodman to third parties. (Id.) The adjustment calculated a "documented loss" of $493,077.81. (Id.) SDC further adjusted this amount to a "payable loss" based on the cost to Adolf when the items were purchased as evidenced by invoices, instead of a fair market value or replacement cost basis. This "payable loss" amount was calculated as $457,141.29. The amounts were separated into losses before September 30, 2006 (the $200,000 coverage periods) and the losses after September 30, 2006 (the $500,000 coverage period). The amounts were adjusted the following way:

2

**DIAMONDS**

TOTAL CLAIM STOLEN:   $ 593,396.51

Amount Undocumented:   $157,714.95 (no evidence presented that diamonds sold by Goodman, therefore no coverage awarded)

Sample Reduction:   $ 34,467.33 (only 92.09% of claimed/lost items were accompanied by invoices)

Amounts claimed by Adolf:

Before 9/06:   $ 335,973.56        After 9/06:        $ 99,708.00

**Actual amount covered by JMIC:**

**Before 9/06:        $ 309,394.26        After 9/06:        $ 91,819.97**

**TOTAL DIAMOND CLAIM COVERED by JMIC: $401,214.23**

**JEWELRY**

TOTAL CLAIM STOLEN:   $ 39,947.00

Amount Undocumented:   $ 31,192.00 (no evidence presented that diamonds sold by Goodman, therefore no coverage awarded)

Sample Reduction:   $ 1,469.19 (only 83.22% of claimed/lost items were accompanied by invoices)

Amounts claimed by Adolf:

Before 9/06:   $ 3,985.00        After 9/06:        $ 4,770.00

**Actual amount covered by JMIC:**

**Before 9/06:        $ 3,316.27        After 9/06:        $ 3,969.54**

**TOTAL JEWELRY CLAIM COVERED by JMIC: $ 7,285.81**

**CASH**

TOTAL CLAIM STOLEN:   $ 48,641.25

Amount Undocumented:   $ 0.00

Sample Reduction:   $ 0.00

Amounts claimed by Adolf:

Before 9/06:   $ 18,608.20        After 9/06:        $ 30,033.05

**Actual amount covered by JMIC:**

**Before 9/06:        $ 18,608.20        After 9/06:        $ 30,033.05**

**TOTAL CASH CLAIM COVERED by JMIC: $48,641.25**

The total amount calculated and adjusted as lost before September 30, 2006

was $331,318.73.  The $20,000 deductible was subtracted, leaving $311,318.73

recoverable.  The limit on that policy was $200,000.00, so the entire coverage limit of

$200,000.00 was released to Adolf for the pre-9/06 claims.

The total amount calculated and adjusted as lost after September 30, 2006 was

$125,822.56.  There was no deductible subtracted, which JMIC asserts is a sign of

their good faith because they could have legally subtracted the deductible amount for

the 2006–07 policy.  The $125,822.56 was lost under the $500,000.00 limit policy,

therefore $125,822.56 was the amount released to Adolf for the post-9/06 claims.

JMIC made a payment of $325,000.00 to Adolf to cover these losses on

November 24, 2007.  (Def.'s Mem. in Supp. of Mot. for Summ. J. 4.)  The total amount

owed according to JMIC's calculations is actually $325,822.56 leaving an unpaid

balance of $822.56.  Adolf contests the discounting methods used by JMIC because

there is no language in the policy explaining why JMIC employed these specific

discounting methods.  (Pl.'s Mem. in Supp. of Mot. for Summ. J. 4.)

The policies have identical language except for the coverage limit.  The

language at issue in this case is as follows:

**1. Employee Dishonesty**

a.      "We" cover direct loss or damage to business personal property,
        including "money" and "securities," that "you" own, hold, or for
        which "you" are legally liable.  "We" pay for only those losses
        resulting from dishonest acts:
        1)      committed by any of "your" employees, acting alone, or in
                collusion with other persons; and
        2)      that occur within the policy period.
                        *******
b.      The most "we" will pay in any one occurrence for Employee
        Dishonesty is the "limit" of insurance shown on the

"declarations," even though the occurrence may extend over a number of policy periods.

All loss or damage caused by one or more persons, and involving a single act or series of related acts is considered one occurrence.
                              * * * * * * *

c.    In addition to the above exclusions "we" do not pay for loss or damage:
                              * * * * * * *
      4)    that is not discovered within one year of the end of this policy period;
                              * * * * * * *

e.    Supplemental Employee Dishonesty Coverage
                              * * * * * * *
      2)    "We" will cover loss that would have been covered by the prior insurance, except that the time to discover the loss had expired, and which would be covered by this policy had it been in effect when the acts or events causing the loss or damage occurred. This coverage is limited to the lesser of the "limits" applicable to the prior insurance or the "limit" of this coverage. This is not an additional amount of insurance.

            This supplemental coverage applies only if this Employee Dishonesty Coverage replaces prior dishonesty coverage and became effective on the expiration or termination date of the prior coverage.

## B.  Procedural background

Adolf filed a Complaint against JMIC on April 18, 2008 (Docket No. 1) and filed the current Motion for Summary Judgment on August 27, 2008 (Docket No. 24). Plaintiff requests the Court grant Summary Judgment and award Adolf the full policy limit of $500,000 for loss sustained as a result of the embezzlement and relief under Virginia Code § 38.2-209 for bad faith on the part of JMIC. Plaintiff, in their Reply Brief, also requested damages in the amount of $175,000.00 (the difference in available coverage and amount paid, plus pre-judgment interest). Defendant JMIC

filed a Cross Motion for Summary Judgment on September 5, 2008 (Docket No. 27). JMIC's Motion requests that Summary Judgment be entered in their favor and the case be dismissed.

## II. DISCUSSION

### A.  Standard of Review

A motion for summary judgment lies only where "there is no genuine issue as to any material fact" and where "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The Court must view the facts and the inferences drawn therefrom in the light most favorable to the non-moving party.  Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1004 (4th Cir. 1987).  While viewing the facts in such a manner, courts look to the affidavits or other specific facts to determine whether a triable issue exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "Where no genuine issue of material fact exists," it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted).

### B.  Interpretation of an Insurance Contract

The substantive law of Virginia applies in this case because this case is before

the Court under diversity of citizenship jurisdiction, and because the parties seek interpretation of an insurance application and contract completed and entered into in Virginia.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1937); Pham v. Hartford Fire Ins. Co., 419 F.3d 286, 288–89 (4th Cir. 2005).  "The law of the place where an insurance contract is written and delivered controls issues as to its coverage."  Buchanan v. Doe, 236 Va. 67, 71, 431 S.E.2d 289, 291 (Va. 1993).  The parties agree that Virginia law applies.

The interpretation of a contract is a question of law.  City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc., 271 Va. 574, 578, 628 S.E.2d 539, 541 (Va. 2006); Bentley Funding Group, L.L.C. v. SK & R Group, L.L.C., 269 Va. 315, 324, 609 S.E.2d 49, 53 (Va. 2005).  Where the terms of a contract are "clear and unambiguous," the contract is construed according to its plain meaning, without adding terms not included by the parties.  Bridgestone/Firestone, Inc. v. Prince William Square Assocs., 250 Va. 402, 407, 463 S.E.2d 661, 664 (Va. 1995); Wilson v. Holyfield, 227 Va. 184, 187, 313 S.E.2d 396, 398 (Va. 1984).  Words should be "given their usual, ordinary, and popular meaning.  No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly."  D.C. McClain, Inc. v. Arlington County, 249 Va. 131, 135–36, 452 S.E.2d 659, 662 (Va. 1995).

Exclusionary language should be construed "most strongly against the insurer and the burden is upon the insurer to prove the exclusion applies."  Am. Reliance Ins. Co. v. Mitchell, 238 Va. 543, 547, 385 S.E.2d 583, 585 (Va. 1989); Johnson v. Ins. Co. of

N. Am., 232 Va. 340, 345, 350 S.E.2d 616, 619 (Va. 1986).  Ambiguities "must be found

on the face of the policy," Nationwide Mut. Ins. Co. v. Wenger, 222 Va. 263, 268, 278

S.E.2d 874, 877 (Va. 1981), and language is ambiguous if it is understood in more than

one way.  Lincoln Nat'l Life Ins. Co. v. Commonwealth Corrugated Container Corp.,

229 Va. 132, 136–37, 327 S.E.2d 98, 101 (Va. 1985).   Any ambiguity will be given an

interpretation providing coverage, rather than withholding coverage.  S.F. v. W. Am.

Ins. Co., 250 Va. 461, 465, 463 S.E.2d 450, 452 (1995); St. Paul Ins. v. Nusbaum & Co.,

227 Va. 407, 411, 316 S.E.2d 734, 736 (Va. 1984).


C.  Coverage

   1.  The actions were one occurrence but should be covered under the
   individual policy periods in which they occurred.

      The contract defines an occurrence as "all loss or damage caused by one or

more persons, and involving a single act or series of related acts," and the policy

states they will pay for one occurrence "even though the occurrence may extend over

a number of policy periods."  Adolf asserts that the scheme of embezzlement was one

"occurrence" and the claim should be paid out of the 2006–07 policy period with

coverage of $500,000 because this was when the occurrence was discovered.  JMIC

combats this position by stating that the policy's first clause clearly states that

coverage is only provided for "those losses resulting from dishonest acts . . . that

occur within the policy period."  For this reason, Goodman's embezzlement occurred

during the span of several years and should be covered under those specific policy

8

periods, under those policy limits.  JMIC asserts that the reason the occurrence

language is included is so that all acts of dishonesty committed by an employee are

not considered separate acts subject to the coverage limit for each act of dishonesty.

(Def. Mem. 17–18).[1]

     The relevant language of the contract is:

a.    "We" cover direct loss or damage to business personal property,
including "money" and "securities," that "you" own, hold, or for
which "you" are legally liable.  "We" pay for only those losses
resulting from dishonest acts:

    1)    committed by any of "your" employees, acting alone, or in
collusion with other persons; and

    2)    that occur within the policy period.

              * * * * * * *

b.    The most "we" will pay in any one occurrence for Employee
Dishonesty is the "limit" of insurance shown on the
"declarations," even though the occurrence may extend over a
number of policy periods.

    All loss or damage caused by one or more persons, and involving
a single act or series of related acts is considered one occurrence.

     The critical question here is how to reconcile the contract's terms.  On one

hand, the contract could be read to state that it will only pay for losses occurring

"within the policy period" and the language defining occurrence is used to limit the

payment to one series of related acts of an employee per policy limit.  In other words,

---

[1] JMIC provides the example of a policy with a limit of $10,000 and 188
separate goods stolen and 140 deleted payments.  "If the 'occurrence' language was
not inserted, each theft could arguably be a separate occurrence each subject to a
$10,000 [limit]."  "[C]arriers cannot insure that type of open-ended risk."  (Def. Mem.
17–18).

acts between 10/1/05 and 9/30/06 would be covered under that policy even though the scheme may have continued beyond 9/30/06).  On the other hand, the contract could be read to mean that an occurrence may extend over a number of policy periods and the discovery of the occurrence is the trigger for coverage.  Therefore the losses resulting from acts that "occur" within the policy period could cover dishonest acts from past policy periods.  At best, the contract is ambiguous.

Similar, if not the exact same, terms have been found ambiguous by the Ninth and the Fourth Circuits in  Karen Kane, Inc. v. Reliance Ins. Co., 202 F.3d 1180 (9th Cir. 2000) and Spartan Iron & Metal Corp. v. Liberty Ins. Corp., 6 F. App'x. 176, 2001 WL 301111 (4th Cir. 2001).

The Ninth Circuit in Karen Kane, Inc. v. Reliance Ins. Co. took up this exact same question, and found the term "occurrence" to be ambiguous.  In Karen Kane, the employee's dishonest acts took place over the span of three policy terms (1993–94, 1994–95, and 1995–96).  202 F.3d at 1182.  The court held that all of these acts were one occurrence, but faced the same issue: were the occurrences limited to the temporal policy limits or were they covered under the policy in effect when the dishonesty was discovered?  Id. at 1185.  The court employed the analysis from an earlier California decision, A.B.S. v. Home Ins. Co., 41 Cal. Rptr. 2d 166 (Cal. Ct. App. 4th 1995) and found that the contract provision including the term "occurrence" was ambiguous and should be construed in favor of coverage.  Id.  The court stated that under California law, "an insurer that issues three separate polices for employee dishonesty is 'liable up to its limit of liability for each policy period.'"  Id. at 1186

(citing A.B.S, 41 Cal. Rptr. 2d at 166).

The Fourth Circuit relied on the Karen Kane decision to decide the case of Spartan Iron. This Fourth Circuit unpublished decision analyzed an insurance policy with very similar terms and found the definition of "occurrence" ambiguous because the "definition does not affirmatively indicate whether a series of acts includes acts occurring *outside the policy term*." 6 F. App'x. at 178 (emphasis added). Because there were other policy terms indicating temporal limitation to the policy years, but the definition was unclear, the court deemed the term ambiguous. Id. Moreover, the court referred to cases from different circuits that had attempted to clarify the term "occurrence" but came to different results. The court concluded "this term is fairly amenable to more than one reasonable construction, and therefore is ambiguous." Id. at 179. The contract failed to be clear "as to whether a loss continuing over successive policies was intended to be covered under every policy in effect during the time span in which the employee dishonesty occurred or only the first of those policies." Id. The contract was construed in favor of the insured, therefore the insured was permitted to "recover up to the limit of insurance under each policy in effect during the time the employee dishonesty in question took place." Id. at 181. This, the court decided, was the most favorable to the insured's interests.

Notwithstanding the decisions of the Fourth and Ninth Circuits, the Fifth Circuit in Madison Materials Co. v. St. Paul Fire & Marine Ins. Co., found the term "occurrence" to be unambiguous. 523 F.3d 541, 544 (5th Cir. 2008). The court held that there was a single cause of injury and the policy stated that "multiple related

11

acts are to be treated as a single occurrence, there was only one occurrence of employee dishonesty over the ten year period." Id. The plaintiff in that case asserted that there was a "single occurrence of employee dishonesty *in each* policy period." Id. (emphasis added).   The court acknowledged that the Fourth and Ninth Circuits found the term to be ambiguous but held that "we are not persuaded that under Mississippi law, the definition of occurrence in this policy is ambiguous." Id. at 545. The court further expressed their interpretation of the clause "only for loss you sustain through acts committed or events occurring during the policy period" to exclude coverage for losses occurring outside the insurer's coverage.  The court awarded the insured coverage for the current policy's loss limit of $350,000. Id. "The only way that Madison could recover for losses incurred in a prior policy period would be if the losses incurred in the current policy period totaled less that the current policy's limit, and then only to the extent required to bring the insured's recovery up to the current policy's loss limit, here $350,000." Id. at 545–46.

From the established case law there appears to be a circuit split on the issue, however, the Fourth Circuit precedent appears to control.  After reading the policy language several times, the same question plaguing the courts—whether the occurrences are limited to their specific policy periods and coverage amounts, or whether the insured parties can collect for an occurrence in the policy period in existence at the time of discovery—is at issue here.  After reading the opinions from Karen Kane and Spartan Iron, it becomes evident that the language is ambiguous and should be read in favor of coverage.

Adolf contends that because the policy language is ambiguous, it "should be read expansively in favor of Adolf Jewelers, and coverage should be awarded up to the $500,000.00 policy limit of the 2006–2007 policy year." (Pl. Mem. 16.)  Adolf is correct in its assertion that because there is ambiguity, the contract should be read in favor of coverage.  Virginia law is clear that when construing contract language, "where there is doubt as to [the] meaning, in favor of that interpretation which grants coverage, rather than that which withholds it.  Where two constructions are equally possible, the construction most favorable to the insured will be adopted."  Nusbaum & Co., 227 Va. at 407, 316 S.E.2d at 734.  The question is, does that mean this Court should read the language the way the Plaintiffs want the contract read?  If so, there is danger that this would change the contract so drastically that it is not the same contract envisioned by the parties.  The contract clearly says—and there is no disagreement regarding this clause—that JMIC only pays for those losses "that occur within the policy period." (Pl. Mem. 5–6.)  If this Court grants coverage based on losses that occur outside the policy period because the word "occurrence" is ambiguous, this directly contradicts the temporal language of the current policy.

JMIC provides justification for their use of "occurrence" by explaining the reason such term is included is to prevent one employee's multiple thefts from being covered separately every theft, and explains that there are two different types of insurance policies: "claims made" and "occurrence."  "Claims made" policies cover claims when they are discovered and claimed, regardless of when the acts causing the claim occurred.  St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 535 n. 3

(1978). "Occurrence" policies are those where "[o]nce the occurrence takes place, coverage attaches to the policy in force at the time of the occurrence, even though the claim may not be made until some prescribed discovery period thereafter." (Def. Mem. 10.); see id. By awarding Adolf the remainder of the amount collectable under the current policy limits, this Court would be changing an "occurrence" policy into a "claims made" policy.

The Court holds, as the Fourth Circuit did in Spartan Iron, and the Ninth Circuit did in Karen Kane, that the terminology is ambiguous, but deems the "occurrence" to have taken place over several policy periods and therefore Plaintiff is entitled to recover "up to the limit of insurance under each policy in effect during the time the employee dishonesty in question took place." Spartan Iron, 6 F. App'x. at 181; Karen Kane, 202 F.2d at 1184 ("Where indemnity is afforded through separate and distinct contracts for specific policy periods the insurer is generally held liable up to its limit of liability for each policy period."). Because this is the case, Adolf has already received payments under the separate policy periods for which Goodman embezzled the funds.

### 2. The Supplemental Coverage provision does not retroactively cover losses before 2005–06.

Plaintiff alternatively contends that the Supplemental Coverage obtained by Plaintiff would cover the past losses. (Pl. Mem. 11–13.) The dispute is whether the Supplemental Coverage would permit Adolf to collect for losses prior to the 2005–06

policy.  JMIC denies Plaintiff's claim that the Supplemental Coverage applies because

they assert that the Supplemental Coverage only applies to the immediately

preceding policy period, not to years prior to the previous year (here, anything prior

to the 2005–06 policy coverage period). (Def. Mem. 20–22.)  As it stands, the method

used by JMIC to calculate their payment to Adolf was done by calculating the losses

before September 30, 2006 and after September 30, 2006.  The losses before

September 30, 2006 were bundled together because JMIC asserts that any coverage

before September 30, 2005 is barred by the language of the contract and therefore can

only be collected under one policy limit, $200,000, the limit for 2005–06.  Adolf

contests this because, as they see it, the Supplemental Coverage uses the word

"limits" which is plural indicating that the Supplemental Coverage is not limited to

the immediately preceding period, but includes all past periods.  (Pl. Mem. 12.)

     The relevant language of the contract states:

> "We" will cover loss that would have been covered by the prior
> insurance, except that the time to discover the loss had expired, and
> which would be covered by this policy had it been in effect when the
> acts or events causing the loss or damage occurred.  This coverage is
> limited to the lesser of the "limits" applicable to the prior insurance or
> the "limit" of this coverage.  This is not an additional amount of
> insurance.
>
> This supplemental coverage applies only if this Employee Dishonesty
> Coverage replaces prior dishonesty coverage and became effective on
> the expiration or termination date of the prior coverage.

     It is clear that the use of the term "limits" in the contract was done to make the

phrase grammatically correct.  The reason "limits" is used is to indicate the choice

between the current limit and the past limit, not that multiple periods in the past can

be used by the insured to collect over and above the current policy limit.

Plaintiff further asserts that the position of restricting the limits to the current and immediately preceding policy periods makes the Supplemental Coverage worthless because there is proactive coverage under these policies for loss or damage discovered within twelve months of the end of the current policy. (Pl. Ex. A.) According to Plaintiff, if there is proactive coverage of twelve months, then why would an insured want to purchase supplemental retroactive coverage that applies to the past twelve months? (Pl. Mem. 12.) Virginia law requires that an interpretation of a contract not render a term meaningless. City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc. 271 Va. 574, 578, 628 S.E.2d 539, 541 (Va. 2006).

JMIC counters this argument by arguing that the Supplemental Coverage only applies if it replaces prior coverage and became effective on the termination or expiration date of the prior coverage. Inherently, only one Supplemental Coverage policy can replace prior coverage because only one policy can become effective on the expiration date of the prior coverage. The 2004–05 coverage expired on September 30, 2005 and the policy in question became effective September 30, 2006, therefore the current Supplemental Coverage cannot apply to the 2004–05 policy because it did not become effective on the termination date of the 2004–05 policy. The Court agrees.

Moreover, there is no validity to the claim that the Supplemental Coverage is "meaningless" in this instance, because if the limit for 2005–06 had not been met, then loss in the 2006–07 period could be collected under the Supplemental Coverage. For this reason, Adolf's claim is irrelevant. Any assertion that this interpretation

16

renders the term meaningless is a clear attempt to manipulate the language beyond its ordinary meaning.

The Court finds that the Supplemental Coverage does not apply to policy periods other than the immediately preceding policy period, therefore Plaintiff cannot collect any further loss under this Supplemental Coverage policy. Accordingly, Defendant's Motion for Summary Judgment as to the issue of coverage is GRANTED, and Plaintiff's Motion for Summary Judgment on the identical issue is DENIED.

### D. Bad Faith: The issue of bad faith is a question of fact and is therefore inappropriate for disposition through summary judgment.

Adolf asserts bad faith on the part of JMIC and seeks attorneys' fees and costs as compensation. An insured may recovery attorneys' fees and costs incurred in pursuing coverage against an insurer who has denied coverage in bad faith. Va. Code Ann. § 38.2-209 (2008). Denial of coverage or failure or refusal to make payment to the insured under the policy in bad faith constitutes a valid reason to award attorneys' fees and costs. Id. Good faith, and in the alternative, bad faith, is determined under a reasonableness standard. CUNA Mut. Ins. Soc. v. Norman, 237 Va. 33, 38, 375 S.E.2d 724, 726–27 (Va. 1989). The Supreme Court of Virginia in Norman stated that this statute is "designed to punish an insurer guilty of bad faith in denying coverage or withholding payment and to reimburse an insured who has been compelled by the insurer's bad faith conduct to incur the expense of litigation. Id. at 727. The court enumerated certain factors to consider:

17

[1] whether reasonable minds could differ in the interpretation of policy provisions defining coverage and exclusions; [2] whether the insurer had made a reasonable investigation of the facts and circumstances underlying the insured's claim; [3] whether the evidence discovered reasonably supports denial of liability; [4] whether it appears that the insurer's refusal to pay was used merely as a tool in settlement negotiations; [5] and whether the defense the insurer asserts at trial raises an issue of first impression or a reasonably debatable question of law or fact.

Id.

### 1. Denial of coverage based on the language of the policy was not in bad faith.

Plaintiff asserts several instances of bad faith on the part of JMIC. The first argument is that JMIC's denial is unreasonable on its face because the policy is clear that occurrences "occur" during the discovered time period, therefore they should have been able to collect under the $500,000 limit period, and the fact that JMIC allocated the losses to two different policy periods is evidence of bad faith. This argument lacks merit, as this Court has already recognized the ambiguous nature of the policy and held that JMIC's distribution was the more appropriate coverage according to the policy.

Secondly, Adolf states that JMIC 's denial of coverage under the Supplemental Policy is "woefully unsupported by any language in the Policy." However, as discussed above, Plaintiff wishes to assert that the use of "limits" refers to multiple prior periods, even though this is counter to the plain language of the contract and the requirement that the Supplemental Coverage policy terminate on the same date as the current policy's effectiveness. For this reason, the Court finds no bad faith on the part of JMIC for denial based on the language of the policy.

**2.  There is no bad faith based on JMIC's failure to acknowledge Adolf's proposed "industry standards."**

Plaintiff also asserts that JMIC disregarded the insurance industry examples, or "standards," sent from Adolf to JMIC in the initial disclosure period and that JMIC failed "to educate itself" about industry practices.  (Pl. Mem. 19.)  Adolf submitted two examples of coverage from other companies that allow for recovery under *any* prior policy, and therefore Defendant should understand Adolf's claim under their Supplemental Coverage argument and award coverage.  One of the submitted "industry standards" is a Policy which states:

> Loss Sustained Partly During This Insurance And Partly During Prior Insurance.  If you "discover" loss during the Policy Period shown in the Declarations, resulting directly from an "occurrence" taking place: . . . Partly during the Policy Period(s) of any prior cancelled insurance that we or any affiliate issued you or any predecessor in interest; and this insurance became effective at the time of cancellation of the prior insurance, we will settle the amount of loss that you sustained during this Policy Period.  We will then settle the remaining amount of loss that you sustained during the Policy Period(s) of the prior insurance.

(Pl. Exhibit F.)  This policy is clearly different than the Supplemental Coverage language in the case before the Court.  In that example policy, the insurance company clearly stated "period(s)" indicating they intended to cover losses from multiple past periods, not just the period immediately preceding the current coverage period.  The language in the present contract states that the only prior coverage periods covered by the Supplemental Coverage are those that expired on the same day as the current policy took effect.  In the Court's opinion, Adolf's assertion of bad faith based on the evidence of a differently worded contract and assertions about

JMIC's failure to know about its own industry's practices fails to rise to the level of bad faith denial of coverage.

### 3. JMIC's reliance on case law is not evidence of bad faith.

Adolf asserts that JMIC's reliance on Karen Kane and Spartan Metal was misplaced and such reliance is evidence that JMIC is trying to avoid their responsibility. This assertion is clearly lacking as evidence of bad faith. As discussed above, the decisions in Karen Kane and Spartan Metal are themselves ambiguous and not entirely dispositive of the outcome of this case. JMIC's use of this case law precedent is completely warranted, as the cases can be read to help their assertions, and in fact, this Court has already held that such authority supports JMIC's position. Therefore, bad faith is not evident from JMIC's reliance on case law in this matter.

### 4. JMIC's calculation methods raise a factual issue not suited for summary judgment.

On this claim, and this claim only, is there a valid question of bad faith. As stated in the facts, from the claim made by Adolf ($684,774.76), the "documented loss," meaning the loss that could be documented as sold and therefore falling within the coverage of the plan,[2] was determined to be $493,077.81. From that amount, the appraiser separated the claims into what type of item was lost (diamonds, jewelry,

---

[2] The Employee Dishonesty Plan states that it covers "dishonest or fraudulent acts committed with the apparent intent to cause "you" to sustain loss or damage and to obtain financial benefit for any employee. . ." (Pl. Ex. A.)

and cash) and the claims were further divided into the times they were reported missing (before or after September 30, 2006).  These calculations appear to be valid and do not evidence bad faith because JMIC had a right to calculate their coverage based on those items which the employee used to "obtain financial benefit" for himself and the amounts had to be separated so the policy limit distinctions could be applied.

However, the "sampling method" employed by JMIC's auditor may be problematic.  Adolf provided 92.09% of invoices for the stolen diamonds and 83.22% of invoices for the stolen jewelry, therefore JMIC determined the "documented losses" should be reduced across the board by 7.91% and 16.78% respectively.  JMIC states that it calculated the losses this way because they were "required to take on faith what Adolf said its stolen goods were worth." (Def. Mem. 25.)  Defendant contends that they helped out Adolf by hiring a forensic accountant to count the losses, rather than "force Adolf to provide documentary evidence of the actual 'cost' of each and every one of the 188 diamonds and jewels Adolf stated were stolen (which JMIC could have clearly enforced)" and chose to do "a sampling and asked for random actual invoices from Adolf on a much less burdensome level." (Def. Mem. 24.)

Upon review of the contract terms, the contract requires that, "The value of covered property is based on its replacement cost without a deduction for deprecation, unless Actual Cash value coverage is shown on the 'declarations.'" (Pl. Ex. A.)  Either a replacement cost method or an actual cash value coverage method would have been appropriate in this case, but neither was used.  At the motions

hearing, Defendant provided no clear explanation as to why these calculation methods were not employed.  Even after being questioned by the Court as to the specific methods, Defendant could not explain its calculation methods.  It is evident that additional facts are required to determine if JMIC's calculations resulted in a sufficient payment to Adolf.

Appraisal is also provided for in the contract.  The contract states that "if 'you' and 'we' do not agree on the amount of the loss, either party may request that the amount be determined by appraisal."  The contract further provides for the method of selection of an appraiser and further procedures.  (Pl. Ex. A).  Adolf failed to explain why they did not request appraisal rights during the period of calculation.

Because neither party adequately addressed and provided support for why a certain calculation method should or should not have been used, the Court cannot definitively address the damages asserts by Adolf or the issue of JMIC's bad faith.  If the calculation methods can be justified, then the question of bad faith can be addressed.  But without factual support, there remains a question of fact inappropriate for summary judgment.  Therefore, as to the issues of calculation of loss, undocumented loss, and bad faith, Plaintiff and Defendant's Motions for Summary Judgment are DENIED.


## III. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment on the coverage issue is GRANTED.  Plaintiff's Motion on the identical issue is DENIED.

Further, Plaintiff and Defendant's Motions for Summary Judgment on the issues of calculation of loss and bad faith are DENIED.  These issues, alone, will be the issues to be decided at trial on October 29–30, 2008.  Moreover, the Court will decide on the issue of damages, if any, after hearing the evidence at trial.

It is SO ORDERED.

/s/
James R. Spencer
Chief United States District Judge

ENTERED this 22ⁿᵈ day of October 2008